(88 South. 68)

No. 22725.

JOHN M. PARKER CO. v. E. MARTIN & CO. et al.

(Nov. 3, 1920. On Rehearing, Feb. 28, 1921.)

(Syllabus by Editorial Staff.)

1. Evidence ⬥20(1)—Judicial notice that agricultural products form a large part of property stored in public warehouses.

The court may take cognizance of the fact that the agricultural products of the United States form a large part of the property ordinarily stored in public warehouses, especially in the state of Louisiana.

2. Warehousemen ⬥17—No seller's lien on products for which negotiable warehouse receipts have been acquired by third persons in good faith.

Act No. 63 of 1890, giving seller of agricultural products a lien for purchase price during the first five days following delivery, held inoperative as to property for which negotiable warehouse receipts in proper form have been acquired for value and in good faith by third persons, having been repealed in so far as it affects such property by the Uniform Warehouse Receipts Act (Act No. 221 of 1908, §§ 1, 2, 4, 5, 40–49, 60).

3. Sales ⬥302—Sale held to have taken place within state, though subject-matter at time of agreement was in other state.

A seller, within the state, of cotton situated outside of state to buyer within the state, to be delivered within the state to buyer, after delivery to seller under separate and independent agreements by shipment to seller's order or to shipper's order with directions to notify seller, was entitled to lien for the five-day period following delivery under Act No. 63 of 1890, giving seller of agricultural products in the state such a lien; the sale having taken place in the state, and not in the other state in which the cotton was situated at the time the contract was entered into, notwithstanding the lapse of a few days between the date of agreement and the actual delivery.

4. Sales ⬥302—Sale by sample of cotton situated in other state takes place within state entitling seller to lien.

If sale of cotton was made by sample taken from the cotton intended to be delivered, the title passed at the time of the agreement, where the cotton being sold was definite and the price was fixed and the parties had consented, though the cotton at such time was situated in other state, and was not to be delivered to buyer until shipped to seller from such other state; the sale in such case being made within the state, entitling seller to the lien during the five-day period following delivery given by Act No. 63 of 1890.

5. Sales ⬥313—Seller not estopped to assert lien on agricultural products by placing bills of lading in hands of buyer to negotiate.

Seller of cotton was not estopped to assert lien under Act No. 63 of 1890, giving seller of agricultural products lien for five days

following delivery, because of its having placed bills of lading in the hands of buyer for the purposes of negotiation without having in writing waived its lien.

## On Rehearing.

**6. Sales ⬤⇒315—Seller's lien on agricultural products enforceable by sequestration.**

Lien given seller of agricultural products during five days following delivery by Act No. 63 of 1890 should be enforced by seizure in sequestration proceedings during such five-day period under Code Prac. art. 275, par. 7.

**7. Sales ⬤⇒315—No personal judgment against third person in seller's sequestration proceeding to enforce lien.**

In proceeding by seller of cotton to enforce lien under Act No. 63 of 1890' against third person by sequestration, where third person had retained the cotton by execution of bond under Code Prac. art. 280, and had thereafter sold the cotton, the seller was not entitled to a direct money judgment against third person or against his surety in such original proceeding, but was entitled merely to have its claim against buyer liquidated with recognition of lien and with the right to have claim or as much thereof as the proceeds of the cotton will discharge satisfied out of such proceeds.

**8. Sequestration ⬤⇒20—Defendant, who sold property after release, not liable for interest on price received.**

Where defendant, in sequestration proceeding after release of property by execution of bond, sold the property, its obligation to plaintiff was merely to produce the market value of the sequestered goods at the date it was called upon to produce it after final judgment, and it is not liable for interest on the price received.

Appeal from Civil District Court, Parish of Orleans; George H. Théard, Judge.

Suit by John M. Parker Company against E. Martin & Co. and another. Judgment for defendants, and plaintiff appeals. Reversed and rendered.

John D. Miller, of New Orleans, for appellant.

Hall, Monroe & Lemann, of New Orleans, for appellee S. Gumbel & Co., Limited.

DAWKINS, J. Plaintiff sued E. Martin & Co., a firm of cotton brokers, and the individual members thereof, on an alleged indebtedness of $20,395.32, and coupled with its demand a writ of sequestration under which certain cotton was seized in the hands of other parties. S. Gumbel & Co., Limited, of New Orleans, La., was made a party defendant, and enjoined from disposing of bills of lading for some 180·bales of the cotton; and plaintiff prayed for judgment ordering the delivery of said bills to it, or in default thereof that it have judgment against the said Gumbel & Co., Limited, for the sum of $9,751.39, with interest, as the value of the cotton. The Hibernia Bank & Trust Company was likewise made defendant, and the same relief asked for as to 83 bales of said cotton, or a personal judgment in the sum of $8,000.

This suit was filed on March 14, 1912, and on March 20th E. Martin & Co. were adjudged bankrupt. On March 25th, counsel for Gumbel & Co. filed an exception, suggesting the bankruptcy proceedings, and pleading that the lower court had been divested of jurisdiction thereby as to Martin & Co. Similar exceptions were filed on behalf of the receivers for the bankrupt, and the Hibernia Bank & Trust Company, all of which were, on May 23d, overruled.

Thereafter Gumbel & Co. and Hibernia Bank & Trust Co. pleaded a misjoinder of causes of action and parties defendant. These exceptions were tried and taken under advisement, and on January 17, 1913, counsel for plaintiff took a nonsuit as to its demands against the said bank, whereupon said exceptions were overruled. Again, on January 22, 1913, Gumbel & Co., filed an additional exception of misjoinder of persons and actions, in that, notwithstanding the dismissal of the demands against the bank, plaintiff was still attempting to litigate its claims against Martin & Co. in this case, and in which exceptor had no interest or concern; and on March 7, 1913, plaintiff moved the

dismissal of all of its demands against "Martin & Co., and the individual members of said firm, in which the defendant S. Gumbel & Co., Limited, is not joined as a party defendant, or as to which the defendant S. Gumbel & Co., Limited, has not appeared as a claimant releasing on bond cotton or bills of lading seized under the writ of sequestration herein," which motion was allowed, and the last-mentioned exception overruled.

Reserving its exceptions, Gumbel & Co., Limited, on March 10, 1913, answered that it was the holder of the cotton in good faith under negotiable documents of title, i. e., warehouse receipts and bills of lading, upon the faith of which it had advanced sums in excess of the value of said cotton, and averred that its rights were superior to and could not be affected by any undisclosed claims thereon of the plaintiff. It further pleaded that the plaintiff, having clothed the said Martin & Co. with negotiable muniments of title or indicia of ownership of said cotton, and being charged with the knowledge that said firm would negotiate the same, and plaintiff having itself indorsed the said bills of lading, was estopped to recover of defendant or any one else acting on the faith thereof.

The judgment below was in favor of defendant, and plaintiff brings this appeal.

The case was tried upon an agreed statement of the facts, which we summarize as follows:

The indebtedness of Martin & Co. to plaintiff as alleged was admitted.

Fifty bales of the cotton in dispute, 25 of which were marked "LERO" and 25 "LEER," were sold to Martin & Co. by plaintiff on March 6, 1912, for $2,645.93. On March 8th Sloan & Co., consignee of said 50 bales, gave plaintiff an order on the Illinois Central Railroad Company therefor, which order was appended to a similar one from plaintiff, and both of which were, on the same day, delivered to Martin & Co. Martin & Co. received the cotton from the railroad company on March 9th, and re-marked 38 bales "R◇I," and 12 bales "K⊗S," after which all of it was stored in a public warehouse, and negotiable receipts therefor obtained by Martin & Co. These receipts were indorsed over to S. Gumbel & Co., Limited, who took the same in good faith, for a valuable consideration, and in the regular course of business. On March 11th, plaintiff invoiced the said cotton to Martin & Co., and on the same day, received a check from the latter for the price drawn upon the Hibernia Bank & Trust Company, and receipted the bill. The next day, the bank dishonored the check, and plaintiff sequestered the cotton on March 14th.

In addition to the 50 bales above mentioned, the plaintiff on March 12, 1912, and before it had been informed of the dishonor of Martin & Co.'s check, delivered to the latter four bills of lading for cotton, under contracts previously made, as follows:

| Date B/L. | Issued at | Marks Cotton. | Date Contract Between Parker and Martin. |
|---|---|---|---|
| March 8th | Natchez, Miss. | "JAKE" | March 6th |
| " 9th | Clarksdale, Miss. | "BAB" | " " |
| " " | " " | "BAA" | " 7th |
| " " | Itta Bena. " | "HAM" | " 9th |

| Date Invoice Parker to Martin. | Date Delivery B/L to Martin. | Date Arrival Cotton in New Orleans. | Number of B. C. Covered. |
|---|---|---|---|
| March 11th | March 12th | March 13th | 125 |
| " 11th | " 12th | " 28th | 23 |
| " 11th | " 12th | ( " 19th, | 28 b/c) |
| | | " 28th, | 2 " ) 30 |
| " 11th | " 12th | " 25th | 12 |

The price agreed to be paid for these four lots was $9,751.39.

All four of these bills of lading covered cotton shipped from points in the state of Mississippi, and it was admitted that at the

time of the contracts to sell to Martin & Co., the delivery of the bills of lading, and the rendering of the invoices, it was not in the city of New Orleans or state of Louisiana. The bills were all negotiable in form, were drawn to the order of the shipper with instructions to notify John M. Parker Company, and were indorsed by plaintiff before delivery to Martin & Co. Martin & Co., on March 12th, indorsed and delivered them to S. Gumbel & Co., Limited, who received them in good faith, in due course of business, without any knowledge of the claims of plaintiff, and likewise advanced to Martin & Co. full value thereon. The first lot of 125 bales were seized under the sequestration on March 14th, and later bonded by Gumbel & Co., who sold them under its pledge.

It was further admitted that all of the transactions had with reference to the cotton involved herein (except the 50 bales first mentioned and covered by warehouse receipts) were conducted under the rules of the New Orleans Cotton Exchange, with reference to f. o. b. cotton, as distinguished from "spot cotton."

It was also admitted that—

Plaintiff "was in the habit of delivering negotiable bills of lading indorsed by it in blank to E. Martin & Co., when plaintiff made Martin & Co. sales other than sales of spot cotton. Plaintiff knew that E. Martin & Co. were in the habit of negotiating bills of lading negotiated to them, and knew when it delivered to Martin & Co. the particular bills of lading herein involved that E. Martin & Co. probably would negotiate them, and delivered them to Martin & Co. for the purpose of carrying out the sales and of enabling Martin & Co. to negotiate the documents and raise funds thereon, if Martin & Co. had not sufficient funds to make payment without outside assistance."

It was further shown that on other occasions the checks of Martin & Co., given in payment for cotton to plaintiff, had been held up by the banks, but the amounts thereof were later made good. Plaintiff also knew that the senior member of the firm of Martin & Co. was a man "sometimes careless of his credit."

### Opinion.

Plaintiff relies for recovery upon the provisions of article 3227 of the Revised Civil Code and Act No. 63 of 1890. The article of the Code was made to apply to the city of New Orleans alone, while the Act 63 of 1890 applies to sales made in any of the chartered cities and towns in this state. We find it appropriate therefore to quote only the pertinent provisions of the latter as follows:

"Section 1. Be it enacted by the General Assembly of the state of Louisiana, that any person who may sell the agricultural products of the United States in any chartered city or town of this state shall be entitled to a special lien and privilege thereon, to secure the payment of the purchase money for and during the space of five days only after the day of delivery; within which time the vendor shall be entitled to seize the same in whatsoever hands or place it may be found, and his claim for the purchase money shall have preference over all others, and especially over any warehouse privilege or claim for warehouse charges, or any privilege or claim by the holder of any warehouse receipt. If the vendor gives a written order for the delivery of any such produce and shall say therein that it is to be delivered without vendor's privilege, then no lien shall attach thereto."

The remaining and concluding section repeals all laws in conflict therewith, and especially Act No. 156 of 1888.

### As to the Fifty Bales Held by Gumbel & Co., Limited, under Warehouse Receipts.

There would seem to be little doubt, if this statute stood alone as the law of the case, of the correctness of plaintiff's contention, in so far as the 50 bales covered by warehouse receipts are concerned. The language of that law is plain, and it is made expressly to prevail in favor of the vendor against the holder of a warehouse receipt; and we do not think that the particular manner in which the cotton, in this instance was turned over to Martin & Co. could have availed the

defendant Gumbel & Co. anything more than if there had been merely a delivery from the warehouse of plaintiff. As heretofore stated, plaintiff acquired from the consignee of the cotton, obtaining an order on the railroad company for its delivery, and attached thereto another from itself, directing the delivery to Martin & Co. These orders were not negotiable instruments, in the sense of a warehouse receipt or bill of lading, and the effect was merely to transfer the cotton to the purchaser under an ordinary contract of sale.

However, the statute quoted must be construed in conjunction with the Uniform Warehouse Receipts Act, No. 221 of 1908, and if there be a conflict, the latter, being a later statute dealing with the force and effect of warehouse receipts, must prevail. The title of the Warehouse Receipts Act is as follows:

"An act to make uniform with other states, the laws of the state of Louisiana governing warehouse receipts, by defining warehousemen and fixing their qualifications, defining their duties, providing the manner, method and character of receipts to be issued, declaring the extent and method of their negotiation and transfer and fixing the rights and liabilities thereunder, and fixing penalties for violation of this act."

The act in its first section merely provides that any warehouseman may issue such receipts, and the second section proceeds to define a negotiable warehouse receipt; section three prescribes the terms which may be inserted, section 4 defines nonnegotiable receipts, and section 5 reads:

"Section 5. *Definition of Negotiable Receipt.* —A receipt in which it is stated that the goods received will be delivered to the bearer, or to the order of any person named in such receipt, is a negotiable receipt.

"No provision shall be inserted in a negotiable receipt that it is nonnegotiable. Such provision, if inserted, shall be void."

Sections 7 and 8 deal with duplicate receipts and the penalties for failure to mark certain receipts "nonnegotiable."

"Part II" of the act, consisting of sections 8 to 36, inclusive, deals with the "Obligations and Rights of Warehousemen upon their Receipts," matters not pertinent to this case; but "part III," covering "Negotiations and Transfer of Receipts," embracing sections 37 to 49, inclusive, contains certain provisions which seem applicable to the issues here, and which we quote, to wit:

"Section 40. *Who may Negotiate Receipt.*— A negotiable receipt may be negotiated—

"(a) By the owner thereof; or

"(b) By any person to whom the possession or custody of the receipt has been intrusted by the owner, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of the person to whom the possession or custody of the receipt has been intrusted, or if at any time of such intrusting the receipt is in such form that it may be negotiated by delivery.

"Sec. 41. *Rights of Person to Whom a Receipt has been Negotiated.*—A person to whom a negotiable receipt has been negotiated acquires thereby—

"(a) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value; and

"(b) The direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt as fully as if the warehouseman had contracted directly with him."

Section 42 deals with transfers in which a receipt is "not negotiated" in the strict legal sense, and with rights under nonnegotiable receipts; section 43, with the transfer without indorsement; 44, with the warranties of the person who negotiates a receipt; 45, with the effect of an indorsement and 46, with the effect of accepting payment of the debt for

which a receipt is held as security. Section 47 provides:

"Sec. 47. *When Negotiation not Impaired by Fraud, Mistake or Duress.*—The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of 'duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was induced by 'fraud, mistake or duress to intrust the possession or custody of the receipt to such person, if the person to whom the receipt was negotiated, or a person to whom the receipt was subsequently negotiated, paid value therefor, without notice of the breach of duty, or fraud, mistake, or duress."

We also quote section 48 as showing the far-reaching purpose of the law to cut off undisclosed claims or equities in third persons. It reads:

"Section 48. *Subsequent Negotiation.*—Where a person, having sold, mortgaged, or pledged goods which are in a warehouse and for which a negotiable receipt has been issued, or having sold, mortgaged, or pledged the negotiable receipt representing such goods, continues in possession of the negotiable receipt, the subsequent negotiation thereof by that person under any sale or other disposition thereof to any person receiving the same in good faith, for value and without notice of the previous sale mortgage, or pledge, shall have the same effect as if the first purchaser of the goods or receipt had expressly authorized the subsequent negotiation."

If the law stopped here, it might be argued with some plausibility that the two statutes could stand together—that is, that Act No. 63 of 1890, dealing exclusively with the lien and privilege of vendors upon agricultural products, existing for the limited period of five days, and subsisting for that time in "whatever hands" they might be found, would remain in force as to that character of goods unless the receipt bore the inscription "without vendor's lien," and that Act No. 221 of 1908 would apply to warehouse receipts for all other commodities and to agricultural products after the expiration of five days. But even under those circum-

148 LA.—26

stances such an intention on the part of the Legislature hardly seems probable, in view of the declared purpose to enact a uniform warehouse receipts law, as indicated by the title and sweeping provisions of the latter act. However, all doubt as to the intention of the lawmaker seems to have been removed by the next section, No. 49, which we quote, viz.:

"Sec. 49. *Negotiation Defeats Vendor's Lien.*—When a negotiable receipt has been issued for goods no seller's lien or right of stoppage in transitu shall defeat the rights of any purchaser for value in good faith to whom such receipt has been negotiated whether such negotiation be prior or subsequent to the notification to the warehouseman who issued such receipt of the seller's claim to a lien or * * * stoppage in transitu. Nor shall the warehouseman be obliged to deliver or justified in delivering the goods to an unpaid seller unless the receipt is first surrendered for cancellation."

It is not disputed that plaintiff had sold this 50 bales of cotton to Martin & Co., in fact, its sole hope of recovery rests upon the vendor's lien, as specially protected by the Act 63 of 1890; and section 60 of the Warehouse Receipts Act repeals all laws or parts of laws in conflict therewith. It reads:

"Section 60. *Inconsistent Legislation Repealed.*—All acts or parts of acts inconsistent with this act are hereby repealed."

[1, 2] Counsel for plaintiff say, correctly, that a repeal by implication is not favored in the law, and that a general law does not repeal a special law, unless the intention to do so be clear and unmistakable; the idea being that Act 63 of 1890 is a special law in the sense that it deals with a particular species of lien upon a certain class of property. However, we think that we may take cognizance of the fact that the agricultural products of the United States form a large part of the property ordinarily stored in public warehouses, and especially in this state; and to say that the law did not apply to a commodity, such as cotton, would go a long

way towards defeating the purpose of the law and the commercial value which such receipts were intended to have under the Uniform Warehouse Receipts Act. In our opinion, the two acts, 63 of 1890 and 221 of 1908, cannot be construed together, in so far as negotiable warehouse receipts are concerned, and the latter must be held to have repealed the former in its operation upon property for which negotiable warehouse receipts, in proper form, have been acquired for value and in good faith by third persons. Lewis' Sutherland Statutory Construction (2d Ed.) vol. 1, p. 533, § 276; Commercial Bank v. Canal-Louisiana Bank, 239 U. S. 520, 36 Sup. Ct. 194, 60 L. Ed. 417, Ann. Cas. 1917E, 25; Arbuthnot, Latham & Co. v. Richheimer & Co., 139 La. 797, 72 South. 251.

### As to the Remainder of the Cotton Covered by Bills of Lading.

As to the remainder of the cotton, the Uniform Warehouse Receipts Act has no application; but defendant Gumbel & Co., Limited, relies upon other considerations for escape from the application of the lien accorded under Act No. 63 of 1890, which are stated in the brief as follows:

"(a) The cotton upon which defendant would assert a lien, was situated, when sold, outside the state of Louisiana, and title to it passed outside the state, so that the laws of Louisiana relating to vendor's lien, and particularly the statute referred to, have no application.

"(b) The statute referred to was intended by the Legislature to apply only to the sales of 'spot' cotton situated in a chartered city or town of this state, i. e., cotton actually on hand for delivery at the time of sale, and was not intended to apply to cotton not on hand, but situated at the time in another state, being what is known in the trade as f. o. b. cotton, or cotton to arrive, dealings with regard to which have developed entirely since the passage of the Act of 1890, and which were not within the contemplation of the Legislature.

"(c) That even if Act 63 of 1890 could apply to sales of cotton outside the state, the plaintiff would be estopped from asserting any lien because it itself clothed Martin & Co. with the indicia of title represented by a negotiable bill of lading which plaintiff itself indorsed and which it placed in Martin's hands well knowing that he would negotiate the same, and, indeed, for the express purpose of permitting him to negotiate it."

[3] In support of the first proposition (a), defendant has cited the cases of Witt Shoe Co. v. Seegars & Co., 122 La. 145, 47 South. 444; State v. Shields, 110 La. 547, 34 South. 673; Succession of Welsh, 111 La. 801, 35 South. 913, 64 L. R. A. 823; Borne v. Alexander Hardwood Co., 140 La. 315, 72 South. 979. These decisions are not applicable to the facts of the present case. In the Seegars Case, while it was held that, as a matter of fact, the traveling salesman of the plaintiff did not have authority to close the contract unconditionally for the sale of the shoes in Louisiana, regardless of that fact, the sale was incomplete until a certain and definite lot of shoes was selected from the general stock of the seller and appropriated to the contract, and that this was accomplished when the plaintiff, in another state, selected the shipment and delivered it to the transportation company; the sale being thereby perfected in such other state. In the case of State v. Shields, the same conditions existed, that is, Shields, as the traveling representative of Webb, a liquor dealer doing business in the parish of Ouachita, obtained an order from a party in the parish of Winn for a quantity of whisky, less than five gallons, which was forwarded to Webb for filling; and it was held that the sale was not complete until the particular lot of whisky had been selected and delivered to the carrier in Monroe, and hence that the sale was made and the title passed in the parish of Ouachita. The same was true in the case of Succession of Welsh, and in which it was also found as a matter of fact that the order taken in Louisiana was subject to the approval of the seller in another state. In Borne v. Hardwood Company, the evidence

did not disclose where the contract was made, but one party resided in Michigan and the other in Louisiana, while the lumber was delivered to a representative of the purchaser in Tennessee, the notes for the purchase price were made payable at a bank in the state of Arkansas, and the lumber finally delivered in Michigan. It was held that the contract was governed by the common law, and that no vendor's lien existed under the law of this state. In all of these cases, the vendor and vendee were residents of different places, in which distinct laws operated, and the appropriation of and delivery of the goods to the carrier were in furtherance of the executory provisions of the contract between them; whereas in the present case both vendor and vendee were residents of the city of New Orleans and state of Louisiana, the contract was made here, contemplated delivery here, and delivery was actually made here, both of the bills of lading and the cotton itself. True, it is admitted that at the time of the contract to sell the cotton was in the state of Mississippi, but two of the shipments, one for 23 and the other for 30 bales, were consigned to the shipper's own order, with instructions to notify a firm other than that of plaintiff, and the latter only acquired the right thereto by the indorsement over to it of said other firm of the bills of lading after their arrival here, and presumably after the payment of the price due the shipper necessary to release said bills of lading. As to the other two shipments, one for 125 bales and the other for 12 bales, the bills of lading were likewise to the shipper's own order, with directions to notify plaintiff, and the same conditions, as to the payment of the price obtained in order to procure their release. So that, in neither case were the selection or appropriation of the cotton and shipments made by plaintiff company in execution of the contract with Martin & Co., but in both instances the cotton reached the city of New Orleans under entirely separate and independent agreements. Plaintiff did not undertake to deliver, and did not deliver either actually or technically any cotton in the state of Mississippi to Martin & Co. The fact of its presence in that state was a mere incident or circumstance of the arrangement under which plaintiff itself acquired, and its arrival in New Orleans was necessary before plaintiff could perform the executory provision of its contract for delivery to Martin & Co. The title to the cotton therefore passed in the state of Louisiana, and all rights incident to the contract are governed by the law of this state. See Elliott on Contracts, vol. 2, title, Conflict of Laws, § 1110, et seq.

[4] We do not think that the rules of the New Orleans Cotton Exchange, relied upon by defendant, and with reference to which the contract was made, can affect the case. Those rules apply to sales made "on actual samples," and provide that the cotton shall be at buyer's risk under certain conditions, and for a fixed period of time; but to concede that these sales were made on samples would destroy or remove from the case the very basis upon which the contracts in the cited cases were held not to be governed by the law of Louisiana, in that there had been no selection or appropriation of specific property at the time of making the sale. If samples were furnished, we take it that the identical cotton from which they were taken was intended and would be delivered, and hence the reason for the ruling in the cited cases would disappear, and there would be nothing to prevent the title from passing in Louisiana, since the thing was definite, the price was fixed, and the parties had consented. R. C. L. vol. 5, p. 963, § 46; Succession of Welsh, 111 La. 801, 35 South. 913, 64 L. R. A. 823, and note; Brent v. Shouse, 16 La. Ann. 158, 79 Am. Dec. 573; Beirne v. Patton, 17 La. 589; R. C. C. 1909.

Under the third heading (c), it is argued that the Legislature could not have had in contemplation any such transaction as that now known to the trade as f. o. b. sales, or sales of cotton to arrive, since it is said this method of dealing has arisen since the passage of the statute of 1890. However, as above indicated, we have found that both the sale and delivery under the contract were made in the city of New Orleans, and we see no good reason why the act should not apply, merely because a few days elapsed between the date of the agreement and the actual delivery of the cotton. The law seems to be general in its application, and it is not for us to create exceptions.

### Plea of Estoppel.

[5] We come now to the contention that plaintiff is, in equity, estopped to assert its lien under Act No. 63 of 1890, because of its having placed the bills of lading in the hands of Martin & Co., for the purposes of negotiation, under the circumstances detailed above.

Bills of lading of the character of these involved in this case constitute both contracts of carriage between the shipper and the carrier and obligations to deliver the cotton to whomever shall present them, properly indorsed, at destination, and in the latter sense, they partake of the nature of warehouse receipts. In fact, the general law governing this feature of such contracts is the same as that applicable to warehousemen, and, in the absence of Act No. 221 of 1908, there can be little doubt that the vendor's lien would prevail over the claim of a holder of a negotiable warehouse receipt, whatever may have been the circumstances of its negotiation. Does the inclusion of the agreement to carry with the obligation to deliver as a warehouseman give any higher quality to a bill of lading than that possessed by warehouse receipts before the passage of Act No. 221 of 1908? and, if so, why?

The Legislature found it necessary to pass an express law giving warehouse receipts preference over vendor's liens upon movables, including, in our opinion, agricultural products, but in so doing prescribed the particular form and conditions necessary to accomplish that purpose, and which are not possessed by the bills of lading in this case.

The Act of 1890 provides that the vendor of agricultural products of the United States, sold in the chartered towns and cities of this state, shall have a privilege for the payment of the purchase price for five days after delivery "within which time the vendor shall be entitled to seize the same in whatever hands or place it [they] may be found, and his claim for the purchase money shall have preference over all others, and especially over any warehouse privilege or claim for warehouse charges, or any privilege or claim by the holder of any warehouse receipt." Thus the statute, after using the all-embracing language giving the vendor a "preference over all others," mentions especially warehouse receipts, for the reason, no doubt, that it was generally understood that these represented the highest character of negotiable title which could be given to personal property. To hold that the issuance and negotiation of a bill of lading of the character here would have the effect of defeating the vendor's lien would have, under the law as it stood prior to 1908, produced the following results: If A. had shipped to his own order a lot of cotton and indorsed and mailed the bill of lading to B., B. could have negotiated the same to C. for value and without notice, so as to defeat the vendor's lien; but if B., instead of negotiating the bill of lading, surrendered it, obtained the cotton, stored it in a public warehouse, and obtained a negotiable warehouse receipt therefor, he could not have conveyed thereby a title which would have deprived A. of his lien. Yet the bill of lading would form the first

link in the chain of title running from A. through B. to C. In the one case, A. would have placed in the hands of B. a contract of carriage, with obligation of the carrier to deliver the cotton, while in the other he would have permitted or made it possible for B. to obtain the actual possession of the cotton and place it in a public warehouse, and then negotiate the warehouse receipt therefor, upon the faith of which it would seem third persons would have been more justified in acting than upon a mere bill of lading.

Then, again, the indorsement in blank of a bill of lading is equivalent to an order for the delivery of the goods (cotton), and, in order to have the effect of destroying the lien, it is made necessary by the Act of 1890 that the vendor shall direct that "it is to be delivered without vendor's privilege." No such waiver was executed in the present case.

In either case, a bill of lading or a warehouse receipt is but the evidence of the title or right to possession of the property. Can it be said that such evidence of title is stronger than the actual possession of the property itself, where admittedly the property had been sold, but not paid for? No more complete conveyance of title could be conceived than the sale and delivery of the actual cotton, yet we are asked to give a greater force to the evidence of title carrying with it the right to possession, in other words, to the representative of the thing than to the thing itself, merely because of the negotiable character of that evidence. We apprehend that it will not be contended that the vendor's lien would be destroyed by the sale to third persons of a purchaser who had not paid the price of the actual cotton, unaccompanied by a bill of lading, even though the original owner had sold it with the expressed intention that it should be resold.

The statute (Act No. 63 of 1890), in our opinion, provides the only way in which the vendor's lien on agricultural products may be waived or lost; i. e., by written waiver over the vendor's signature. Harris, Parker & Co. v. Nicolopulo, Citizens' Bank, Intervener, 38 La. Ann. 12.

Whatever inconvenience or handicap this state of the law may have been to commerce, the Legislature of 1912 seems to have met by the passage of Act No. 94 of that year, dealing with bills of lading the provisions of which are very similar to those of Act No. 221, of 1908 covering warehouse receipts; section 42 of the former being identical with section 49 of the latter, save that "bill of lading" is used in place of "warehouse receipt."

Without going into a discussion of the several cases cited by counsel for Gumbel & Co., we think it sufficient to point out that the present one is differentiated from all of them by the fact that plaintiff's lien was by statute preserved for five days "in whatever hands or place" the cotton might have gone, and dealers in this particular kind of property must be held to have taken with notice of the law. No such statute existed or was urged in the cases cited.

For the reasons assigned, the judgment appealed from is therefore annulled and reversed, and it is now ordered, adjudged, and decreed that there be judgment in favor of plaintiff, John M. Parker Company, and against S. Gumbel & Co., Limited, recognizing and sustaining its vendor's lien and privilege upon the 125 bales referred to as covered by bills of lading to the extent of $9,751.39, and that it be paid by preference and priority over the claims of S. Gumbel & Co., Limited, from the proceeds thereof. Appellee to pay all costs.

MONROE, C. J., takes no part.

On Application for Rehearing.

PER CURIAM. The application of the defendant S. Gumbel & Co., Limited, for a re-

hearing was denied on the 29th of November, 1920, without disposing of the application of John M. Parker & Co. for a rehearing and for a correction of certain alleged errors or omissions in the decree rendered herein.

In so far as plaintiff's application for rehearing pertains to the 50 bales of cotton for which S. Gumbel & Co., Limited, held warehouse receipts, a rehearing is denied. In all other respects, the rehearing applied for by plaintiff is granted.

## On Rehearing.

SOMMERVILLE, J. The questions before us on this rehearing are: First, as to whether plaintiff is entitled to have its vendor's privilege under Act 63 of 1890 sustained as to 65 bales of cotton which were never seized under the writ of sequestration; second, should it have a personal judgment against S. Gumbel & Co.; and, third, is it entitled to interest on its claim?

It must be borne in mind that plaintiff was not the owner, and was not claiming as such any of the cotton in this case, but merely seeking to be paid by preference the price thereof out of the cotton itself, to satisfy the lien which the law gave under the particular circumstance. It is true that in addition to praying for the sequestration of the cotton it also asked that Gumbel & Co. be enjoined from disposing of the bills of lading, and that it be ordered to turn the same over to the sheriff, or in lieu thereof, the price which Martin & Co. had agreed to pay at 6 per cent. interest from March 12, 1912. However, plaintiff's rights are not to be measured by the prayer of the petition, but by the law applicable to the case. But for Act 63 of 1890, giving special protection to the vendors of agricultural products, plaintiff would have had no recourse either against Gumbel & Co. or the cotton, under the admitted facts of this case, the latter being a third purchaser in good faith, and for value. Therefore we must look to that statute and our law of procedure to determine the measure of plaintiff's rights.

[6] We do not quote the statute again, for it appears in our former opinion, but it is clear from a reading thereof that the Legislature intended that the lien should be enforced by seizure, for it says:

The seller shall have a lien " * * * to secure the payment of the purchase money for and during the space of five days only after the day of delivery; within which time the vendors shall be entitled to seize the same in whatever hands or place it may be found," etc.

The Code of Practice plainly points out that the mode of enforcing a lien or privilege upon specific property is by sequestration. C. P. art. 275, par. 7; Ansley v. Stuart, 119 La. 1, 43 South. 892; Lehman, Stern & Co. v. E. Martin & Co., 132 La. 231, 61 South. 212. In a few cases we have held that where one fraudulently appropriated property upon which another had a lien, to the knowledge of the one so appropriating it, the latter might be made to respond in an action for damages. But that is not the case here, and we know of no law which authorizes the substitution of the writ of injunction for the writ of sequestration.

Not having seized the 65 bales of cotton covered by bills of lading other than the 125 bales marked "JAKE," plaintiff acquired no rights against the same, and its lien expired five days after the sale and delivery to Martin & Co.

[7, 8] As above indicated, plaintiff is not entitled to a direct moneyed judgment against Gumbel & Co., but to have its claim against Martin & Co. liquidated, with recognition of its lien upon the cotton seized, with right to be paid therefrom the purchase price, with legal interest from date of sale to Martin & Co., or so much thereof as the proceeds of the cotton seized will discharge if sold after the finality of the judgment. If the cotton had not been bonded by Gumbel & Co.,

it is highly probable that plaintiff would have done so, and, if not, that the sheriff would have been ordered to sell it, as might have been done at plaintiff's instance, in which event, the said controversy would then have been over the proceeds. However, Gumbel & Co. chose to bond as the law gave it a right to do, and the obligation of that bond, written into it by the law (C. P. art. 280), is that defendant should not send the property out of the jurisdiction of the court; that it should not make any improper use thereof, and that it would faithfully present the same after final judgment, "in case he (it) should be decreed to restore the same to plaintiff." If the condition of the bond fails, i. e., the property is not produced after definitive judgment, then the obligation becomes fixed, that is, the principal and surety are bound to pay the plaintiff the amount thereof, or so much as may represent the value of that portion of the property found to belong to plaintiff or on which its lien rests. But the law nowhere authorizes, so far as we have been able to find, the rendition of a judgment against the principal and surety, in the original proceedings, for the reason, no doubt, that it cannot be conclusively said that the property will not be produced until the parties have failed or refused when called upon in a proper manner to do so; and, further, the value thereof at the time when it should be surrendered cannot be foretold, especially as to a commodity like cotton. Webster Lodge v. Hunter, 133 La. 863, 63 South. 383; Mulligan v. Vallee, 31 La. Ann. 375; Carroll v. Hamilton, 30 La. Ann. 520; Segassie v. Piernas, 26 La. Ann. 742; Baker v. Morrison, 4 La. Ann. 372; Welsh v. Barrow, 9 Rob. 535. If the production of the property would discharge the principal and surety, in a case like this, where there is no personal obliga-

tion or liability to plaintiff on the original demand, then by what theory can it be said that they are liable for interest, simply because in lieu of the property they produce its equivalent, the value at the time of definitive judgment? The sale after bonding was a matter entirely at the discretion of Gumbel & Co., and, in our opinion, did not increase their obligation one way or the other, inasmuch as personal property was involved, and its obligation is to produce the cotton when the plaintiff goes to execute, or its then value. See Segassie v. Piernas, supra, and Baldwin v. Black, 119 U. S. 643, 7 Sup. Ct. 326, 30 L. Ed. 530.

We think therefore that Gumbel & Co. are not liable for interest on the price which they received for the cotton, but that they should pay the market value of cotton of that grade at the date they are called upon to produce it after final judgment herein.

Inasmuch as the entire lot of cotton covered by bills of lading seems to have been sold in one transaction and for a lump price to Martin & Co., it was all liable for the entire purchase price; in other words, if half of it would suffice at the time of definitive judgment to pay plaintiff with legal interest, it could claim no more, but if it required all of that upon the lien was recognized, the entirety would have to be applied. The transaction was indivisible.

For the reasons assigned our former decree is amended so as to allow plaintiff interest at the legal rate from March 1, 1912, as against Martin & Co., with privilege and preference as therein decreed upon the 125 bales of cotton marked "JAKE," and as thus amended our said decree is reinstated and made the final judgment of this court.

MONROE, C. J., takes no part.