In the Matter of WALLACE LINCOLN–MERCURY COMPANY, INC., Bankrupt,

Ford Motor Credit Company, Appellant,

v.

Herschel A. GENTRY, Trustee, et al., Appellees.

No. 71-2700.

United States Court of Appeals, Fifth Circuit.

Nov. 16, 1972.

Rehearings Denied Dec. 11, 1972.

William F. Pipes, Jr., Monroe, La., George V. Burbach, Dearborn, Mich., Peter A. Feringa, Jr., New Orleans, La., for appellant.

Fred W. Jones, Jr., Kenneth W. Campbell, Ruston, La., for bankrupt.

James A. Hobbs, West Monroe, La., for Trustee.

A. K. Goff, Jr., Ruston, La., for Ruston Bank.

Ragan D. Madden, Dist. Atty., Ruston, La., for Mrs. Heard.

Before GEWIN, AINSWORTH and SIMPSON, Circuit Judges.

AINSWORTH, Circuit Judge:

In this bankruptcy proceeding, we must determine the rights of creditors, one of whom claims a preference. In a complex series of transactions, Wallace Lincoln-Mercury Company purchased automobiles from Ford Motor Company (Ford) using credit extended by Ford Motor Credit Company (FMCC). When Wallace filed a debtor's petition in bankruptcy, the general creditors challenged FMCC's claim of preference to the 65 automobiles in Wallace's possession. The Referee in Bankruptcy and the District Judge, 326 F.Supp. 1243, agreed with the general creditors and denied FMCC's claim as a preferred creditor. We reverse.

On April 1, 1957, Wallace initiated its dealership relationship with Ford by signing a Mercury Sales Agreement. The pertinent provisions insofar as this case is concerned follow:

> 6. *(b) Title.* Title to each COMPANY PRODUCT purchased by the Dealer shall pass to the Dealer, or to such financing institution or other party as may have been designated to the Company by the Dealer, upon delivery thereof to the carrier or to the Dealer, whichever first shall occur.

> . . . . . .

> *34.* . . . The parties hereto intend this agreement to be executed as a Michigan agreement and to be construed in accordance with the laws of the State of Michigan.

Wallace subsequently signed a Lincoln Sales Agreement with Ford on December 6, 1968, and the identical paragraphs above were included.

FMCC is a wholly owned subsidiary created by Ford to handle credit arrangements with dealers. Ford gave FMCC flexibility to acquire a security interest in the automobiles by writing to FMCC on September 27, 1961: "As at present, title to any vehicle shipped by us to any of your dealer accounts will continue to pass (to you or the dealer depending on your arrangements with the dealer) upon delivery to the dealer or the carrier, whichever occurs first." FMCC took charge in working out the financial arrangements with dealers who desired to purchase automobiles from Ford on credit.

Wallace was provided with a brochure by FMCC, explaining the proposed Wholesale Plan (in pertinent part):

*Factory Wholesale Method*

The normal method for placing vehicles under the Wholesale Plan is the factory method. Under this method

the Dealer instructs the manufacturer to ship vehicles to him, but to invoice FMCC for the vehicles. FMCC arranges to pay the manufacturer for vehicles delivered to the Dealer. A Trust Receipt and Note, printed on the reverse side of the Daily Transaction Register, are executed for the Dealer by a representative of FMCC under a power of attorney.

.     .     .     .     .     .

*Trust Receipts*

All vehicles placed under the FMCC Wholesale Plan are held in trust by the Dealer and are owned by FMCC. A Trust Receipt evidences that title to the vehicles remains with FMCC (the entruster) until the full invoice price advanced by FMCC is ·paid by the dealer (trustee). . . . Satisfactory relations depend upon strict compliance by the Dealer with the Trust Receipt provisions.

On May 20, 1967, Wallace executed two FMCC documents, (1) an Application for Wholesale Financing and (2) a Power of Attorney to Execute Trust Receipts and Notes. The introductory sentence of the Application incorporated by reference the explanation in the FMCC "Wholesale Plan" brochure referred to above. Paragraphs two and three of the Application state:

Dealer shall execute and deliver to FMCC promissory notes or other evidences of indebtedness and/or trust receipts, conditional sale contracts, chattel mortgages or other title retention or security instruments for the amounts of credit extended by FMCC hereunder and shall execute any additional documents which FMCC may reasonably request to confirm Dealer's obligations to FMCC and to confirm FMCC's title, title retention, lien or security interest in any merchandise financed by FMCC for Dealer under the Plan, and FMCC's title, title retention, lien or security or other interest in any such merchandise shall not be impaired by the delivery to Dealer of such merchandise or of bills of lading,

certificates of origin, invoices or other documents pertaining thereto, or by the payment by Dealer of any curtailment, security or other deposit or portion of the amount financed. . . .

FMCC's title, title retention, lien or security interest in any such merchandise shall attach, to the full extent provided or permitted by law, to the proceeds, in whatever form, of any sale or disposition thereof by the Dealer until such proceeds are accounted for and remitted to FMCC as hereinbefore provided.

Paragraph eight of the Application adds the following:

Dealer waives notice of FMCC's acceptance thereof and this agreement will be deemed accepted by FMCC at the time it shall first extend credit to Dealer under the Plan and shall be binding on Dealer and FMCC and their respective successors and assigns from the date thereof until terminated by receipt of written notice by either party from the other, but any such termination shall not relieve either party from any obligation incurred prior to the effective date thereof.

In the Power of Attorney executed by it, Wallace appointed R. C. White "and any other officer or employee of Ford Motor Credit Company" to be Wallace's "true and lawful attorneys with full power of substitution" to execute FMCC "promissory notes" and "trust receipts."

Wallace then notified Ford of its financial arrangements with FMCC by filling in the printed form entitled "Delivery Instructions" dated May 20, 1967, the provisions of the "Delivery Instructions" being as follows:

Please be advised that the undersigned Dealer has applied to Ford Motor Credit Company for the wholesale accommodations provided under the FMCC Automotive Wholesale Plan for purchases by the undersigned from you of new cars and trucks . . . . You are hereby requested and authorized to handle all deliveries to the undersigned of such motor ve-

hicles in accordance with the terms of the FMCC Automotive Wholesale Plan until you are notified in writing to the contrary by the undersigned. You also are authorized to rescind the sale of, or divert the shipment of, any of such motor vehicles ordered by the undersigned in accordance with the instructions of Ford Motor Credit Company from time to time.

A field representative visited Wallace's office in Ruston, Louisiana, once a month to take orders. When the car was built at the Ford plant and became ready for shipment to Wallace, a data processing system notified FMCC. FMCC then used one of its printed forms entitled "Daily Transaction Register, Promissory Note and Trust Receipt" covering the involved new vehicle. This printed form is on a single sheet of paper. On one side, the Daily Transaction Register lists the car, date, and invoice amount. On the reverse side is a Promissory Note and a Trust Receipt. The Promissory Note was a promise by Wallace to pay to the order of FMCC the invoice amount. In the Trust Receipt, Wallace agreed to the following:

> The dealer, named on the reverse side hereof, hereinafter referred to as the trustee, hereby acknowledges delivery of the items of property . . . described on the reverse side hereof, pursuant to the trustee's order for shipment by the manufacturer of said property, subject to transfer of title thereto by the manufacturer [Ford] to the entruster [FMCC] under the entruster's Wholesale Financing Plan. The trustee further acknowledges that the entruster has a security interest in said property and agrees that the trustee's possession thereof shall be on the following terms and conditions:
>
> 1. Title to said property shall remain in the entruster as security retained for and until the trustee's payment in cash of all amounts payable under the foregoing promissory note.
>
> .   .   .   .   .   .

> 5. The trustee may sell said property at retail in the ordinary course of trustee's business, provided, however, that any and all proceeds thereof shall be fully, faithfully and promptly accounted for by the trustee to the entruster to the extent of the obligation hereby secured.
>
> .   .   .   .   .   .
>
> 8. This agreement shall be interpreted in accordance with the laws of the state of the trustee's place of business shown on the reverse side hereof. Any provision hereof prohibited by law shall be ineffective to the extent of such prohibition without invalidating the remaining provisions hereof.

The Promissory Note and the Trust Receipt were each signed separately for Wallace by the facsimile signature of R. C. White, the agent designated by Wallace in the Power of Attorney heretofore referred to. FMCC paid Ford for the vehicle and sent a copy of the Daily Transaction Register, Promissory Note and Trust Receipt to Wallace.

In addition, Wallace received three documents from Ford, (1) a notice that the car was to be built, (2) a Statement of Origin indicating the car's identification number and the day the car was transferred to Wallace, and (3) an invoice showing total charges due by the dealer. On the front of the invoice was a notation that the car was "Sold to Wallace" and that the "Finance Company" was FMCC, but at the bottom was the statement: "This is for information only and in no way affects the transfer of title." The back of each invoice declared:

> As provided in the Sales Agreement between Ford Motor Company and the Dealer. Check, draft, or other commercial paper received for merchandise covered by this invoice does not constitute payment until Ford Motor Company shall have received cash in full payment thereof, but title shall pass to the dealer, or to the financing institution or other party designated

in "finance company and/or bank" on the face hereof and in any event a security interest shall pass to such institution or party upon delivery of the merchandise to the carrier or to the dealer, whichever first occurs.

For 61 of the vehicles, FMCC paid Ford directly upon notification from Ford that the car was built. As for the other 4 Lincolns, they were obtained by Wallace before it became an authorized Lincoln dealer, so the transactions were handled differently. Wallace ordered the 4 vehicles from Ford's representative, but Ford's Statement of Origin showed a transfer to Harter Lincoln-Mercury, Inc. (an authorized Lincoln dealer in Shreveport, Louisiana) with an assignment to Wallace. The face of Ford's invoice, besides again indicating FMCC to be the finance company, said "Sold to Harter"; and "Ship to (if other than above) Wallace." In connection with the purchase of the 4 vehicles, Wallace executed a Wholesale Security Agreement with FMCC which reads in pertinent part:

> For value received, the undersigned [Wallace] hereby sells, conveys and transfers unto Ford Motor Credit Company all of its right, title and interest in and to the items of property described above and hereby assigns to Ford Motor Credit Company all certificates of title, certificates of origin, original invoices, trust receipts, chattel mortgages, conditional sale contracts and all other documents of title held by the undersigned with respect to the said property.

Instead of FMCC paying Ford, as happened with the other 61 transactions, Harter paid Ford and Wallace paid Harter with funds supplied by FMCC.

For all 65 transactions, in the interim between the time FMCC extended credit and the time Wallace satisfied the debt, Wallace paid interest each month to FMCC's office in Monroe, Louisiana. The final step for all 65 transactions, but for the bankruptcy, would have been Wallace's paying FMCC with the proceeds from Wallace's sale of the vehicles.

■ Under the circumstances here, the law of Louisiana is applicable [1] to decide the question whether appellant FMCC has a lien on the vehicles so as to entitle it to priority in the proceeds in bankruptcy. In Louisiana that lien is known as the vendor's privilege and is provided for in Louisiana Civil Code article 3227.[2] The District Judge believed Louisiana law was applicable, and as far as we can determine, the parties do not disagree that Louisiana law should be applied in this case.[3]

---

1. In this federal bankruptcy case the District Court is not obliged to use the choice-of-law methodology of the forum state, Louisiana. *Compare* Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 161–163, 67 S.Ct. 237, 239–240, 91 L.Ed. 162 (1946); McKenzie v. Irving Trust Co., 323 U.S. 365, 371, n. 2, 65 S.Ct. 405, 408, n. 2, 89 L.Ed. 305 (1945); Speare v. Consolidated Assets Corp., 2 Cir., 1966, 367 F.2d 208, 211, *with* Richards v. United States, 369 U.S. 1, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962); Klaxon Co. v. Stentor Elec. Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *See generally* Hill, The Erie Doctrine in Bankruptcy, 66 Harv.L.Rev. 1013, 1047, n. 135 (1953); 4A Collier on Bankruptcy ¶ 70.04, n. 31 (J. Moore, ed. 1971).

2. The article provides in pertinent part:
   He who has sold to another any movable property, which is not paid for, has a preference on the price of his property, over the other creditors of the purchaser, whether the sale was made on a credit or without, if the property still remains in the possession of the purchaser.
   So that although the vendor may have taken a note, bond or other acknowledgment from the buyer, he still enjoys the privilege.

   •        •        •        •        •

   *See generally* La.Civ.Code arts. 3217(7), 3228–3231; R. Slovenko, Treatise on Creditors' Rights Under Louisiana Civil Law 276–280 (1968); Sachse, Using Inventory as Security: A Civil Law Perspective, 39 Tul.L.Rev. 397 (1965); Comment, Vendor's Privilege, 4 Tul.L.Rev. 238 (1930).

3. Both Wallace and FMCC agreed to the provision in paragraph eight of the Trust Receipt, stipulating the application of the laws in the state of the trustee's (Wal-

In order to decide whether appellant has a vendor's privilege in this matter, entitling it to the proceeds in bankruptcy, we must inquire from what source Wallace derived its title to the vehicles. That title to the vehicles passed from Ford to FMCC is shown by the testimony and the various instruments in evidence, as illustrated by the following: the Sales Agreement between Wallace and Ford states that title to the vehicles shall pass "to the Dealer, or to such financing institution" (in this case FMCC), "as may have been designated to the company by the dealer." The Delivery Instructions by Wallace to Ford state that all deliveries shall be "in accordance with the terms of the FMCC Automotive Wholesale Plan." That Plan makes specific reference to the Trust Receipts which we have previously described, and the Plan states that "all vehicles placed under the FMCC Wholesale Plan are held in trust by the Dealer and are owned by FMCC." The Trust Receipt contains the stipulation between Wallace and Ford that "[t]his agreement shall be interpreted in accordance with the laws of the state of the trustee's [Wallace's] place of business," i. e., Louisiana; it also contains language which states that "The dealer . . .

acknowledges delivery of the items of property . . . subject to transfer of title thereto by the manufacturer to the entruster [FMCC] under the entruster's Wholesale Financing Plan." Printed on the back of each Ford invoice to Wallace for the vehicle involved, is a provision that title shall pass to the financing institution designated on the face of the invoice. All invoices here show such financing institution to be FMCC.[4] In the face of this clear and unambiguous provision on the reverse side of the Ford invoice we find it difficult to understand how appellee can so vigorously (and erroneously) state that "[i]n not a single instance of any invoice in the record is any indication of any intention by the owner of the vehicle, Ford Motor Company, to sell it or convey it to Ford Motor Credit Company." The evidence is all to the contrary.

■■ Thus, while the transaction is complex, it is undoubted that under the agreements signed by Wallace, Ford and FMCC, and the Delivery Instructions, all parties knew and agreed that title would remain in Ford until FMCC paid for the vehicle, that FMCC, the financing institution, paid Ford for the vehicle, and title passed to FMCC.[5] FMCC attempt-

---

lace's) place of business (Louisiana). Since Louisiana has a substantial connection with the contract due to Wallace having its principal place of business in the state and because Louisiana was the place where the automobiles were delivered, the stipulation should be dispositive. *See* R. Leflar, *American Conflicts of Law* 356 (1968).

4. Ford's Statements of Origin relative to the vehicles did not show FMCC as transferee of the automobiles, but the purpose of these documents is merely to satisfy state registration requirements. As illustrated by the following Louisiana provision on Certificates of Title, the state does not focus on transfers of title prior to a sale to a customer. La.R.S. 32:704 provides:

  *Applicability*
  The provisions of this Chapter shall apply to the sale and chattel mortgaging of vheicles of the sort and kind required to be registered and licensed under the provision of Chapter 4 of Sub-

title II of Title 47 of the Louisiana Revised Statutes of 1950, *except that there is specifically excluded from the provisions of this Chapter the sale of a new vehicle prior to the first sale of such new vehicle to a user, as defined herein.* Such exclusion, however, does not exempt from the provisions of this Chapter such first sale made to a user as defined herein.
  (Emphasis supplied.) La.R.S. 32:702(3) defines a "user" as "any person who acquires a vehicle for purposes other than resale and is required to register same under the provisions of the Louisiana Vehicle Registration License Tax Law . . . . " Since FMCC was not a user, the failure to show FMCC on the Statements of Origin is not critical. *See also* La.R.S. 47:473, 501, 509.

5. As for the transactions involving the 4 Lincolns that Wallace acquired prior to becoming a Lincoln dealer, we regard them as essentially the same as the other 61 transactions. Wallace placed the or-

ed to retain title until paid for the vehicle by the dealer. But under Louisiana law, a conditional sale whereby title is retained in the vendor is legally impossible,[6] so the courts respect the contract but ignore the provision retaining title in the vendor. Morelock v. Morgan & Bird Gravel Co., 174 La. 658, 677, 141 So. 368, 374 (1932). By operation of the law of Louisiana title passes to the purchaser but the vendor retains the vendor's privilege provided by Louisiana Civil Code article 3227. Tangipahoa Bank & Trust Co. v. Kent, 5 Cir., 1934, 70 F.2d 139, 141; Christina Inv. Corp. v. Gulf Ice Co., 55 So.2d 685, 687 (1 Cir.La.App.1951). Therefore, the chain of title flows from Ford to FMCC to Wallace. See Edward J. Gay Co. v. Crichlow & Donelson, 29 La.Ann. 122 (Orl.App.1877).

█ The circumstances clearly show a Louisiana transaction, both in origin and in ultimate consummation. Wallace's orders were taken by Ford's representative at Wallace's place of business in Ruston, Louisiana; financing arrangements by Wallace were executed in Louisiana and conducted with FMCC's office in Monroe, Louisiana, where Wallace's payments were to be made; the vehicles were shipped from the place of

manufacture to Louisiana; and finally Wallace's title to the vehicles was derived from FMCC under written agreements, one of which specified particularly that the agreement be interpreted in accordance with Louisiana law. In our view, these circumstances are sufficient to confer the Louisiana vendor's privilege in favor of FMCC.

The District Court's reliance on *Witt* [7] is misplaced. There the creditor, a manufacturer of shoes, was a Virginia corporation which sent a traveling salesman to Louisiana to take orders. The Louisiana Supreme Court said the contract was consummated when the shoes were segregated in Virginia and placed on a carrier for shipment. That case is not apposite since it referred to an executory contract for the sale of an indeterminate object. Here the vehicle ordered by Wallace from Ford was not yet manufactured, but when FMCC entered the transaction the vehicle was in being, bore a serial number, and title was *then* transferred to FMCC by Ford, thence to Wallace. In *Witt*, specific exception was also reserved for transactions where "a specific agreement" [8] existed between the parties, such as occurred here when Wallace and FMCC agreed that their transactions were to be interpreted under Louisiana law.[9]

---

der, as usual, with the Ford representative, and Wallace received delivery as usual. Although the face of the invoice showed "Sold to Harter," the bottom of the invoice said: "This is for information only and in no way affects transfer of title." The back of the invoice said title passed to the financing institution listed on the face, and FMCC is named as the Finance Company on the face of the invoice. The funds went from FMCC to Wallace to Harter to Ford rather than directly from FMCC to Ford. But the end result was the same. In these special circumstances, we respect FMCC as the buyer from Ford, and subsequently as the seller to Wallace, particularly when the 4 transactions are seen against the backdrop of the many other transactions where FMCC paid Ford directly. *See* Cottonport Bank v. Dunn, 21 So.2d 525

(La.App. 1 Cir. 1945); Jeckell v. Fried, 18 La.Ann. 192 (Orl.La.Ann.1866).

6. The only recognized exception may be where the object of sale is brought into Louisiana without the consent of the creditor. Universal C.I.T. Credit Corp. v. Hulett, 151 So.2d 705, 707 (3 Cir. La. App.1963). This exception is unavailable here because FMCC knew the automobiles were destined for Ruston, Louisiana, the location of Wallace's dealership.

7. George D. Witt Shoe Co. v. J. A. Seegars & Co., 122 La. 145, 47 So. 444 (1908).

8. *Id.* at 150, 47 So. at 446.

9. This case differs from our previous decision, In re Hoover, 5 Cir., 1971, 447 F.2d 195, in the stipulations. In *Hoover*, the parties agreed that " 'the sale was consummated in the State of Minne-

The interpretation placed on *Witt* by the District Court does violence to equitable principles and disregards the overwhelmingly dominant Louisiana activity in this case. We reject such a conclusion for the reasons we have already outlined. Furthermore, the Louisiana Supreme Court does not mechanically apply the *Witt* rule.[10] In John M. Parker Co. v. E. Martin & Co., 148 La. 791, 805, 88 So. 68, 72 (1920), the Court distinguished *Witt* by stating, "[I]n the present case both vendor and vendee were residents of the city of New Orleans and state of Louisiana, the contract was made here, contemplated delivery here, and delivery was actually made here, both of the bills of lading and the cotton itself." Even though the object of sale, the cotton, was in Mississippi [11] and not segregated at the time the contract to sell was made, the Court decided that this was a Louisiana contract.

We hold therefore that appellant FMCC is entitled to all the proceeds from the 65 vehicles by priority over all other creditors.

Reversed.

sota,'" and we said, "Regardless of where or when title passed, the parties stipulated that the sale was consummated in Minnesota, and we think the court properly determined from that fact that for the purposes of applying Article 3227 the sale was made outside of Louisiana and must be judged as such." 447 F.2d at 197.

10. Prior to *Witt* a lower court did not regard as essential the existence of segregated goods at the time the contract was made; McLlane v. His Creditors, 47 La. Ann. 134, 16 So. 764 (1895) (at the time of contract, the seller did not have in stock an engine and boiler constituting part of the machinery that was the subject of the contract) ; nor did the Louisiana Supreme Court look into the question in Erman v. Lehman, 47 La.Ann. 1651, 18 So. 650 (1895), although the Court noted that when the goods were ordered they were in other states. The

two courts examined whether the agents taking orders had authority to make binding contracts. Here that problem is obviated because FMCC and Wallace had a long-standing arrangement that was accepted when FMCC first extended credit, according to paragraph eight of the Application for financing.

11. The Court added, in regard to the fact that the cotton was in Mississippi, the following remarks :

Plaintiff did not undertake to deliver, and did not deliver either actually or technically any cotton in the state of Mississippi to Martin & Co. The fact of its presence in that state was a mere incident or circumstance of the arrangement under which plaintiff itself acquired, and its arrival in New Orleans was necessary before plaintiff could perform the executory provision of its contract *for delivery to* Martin & Co.
*Id.* at 806, 88 So. at 73.